IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA )
)
v. ) Case No. 3:21CR14–HEH
)
KWAMANE TEASHAWN HENDRICK, )
)
Defendant. )

## MEMORANDUM OPINION
(Denying Defendant's Motion to Suppress Evidence)

This case is presently before the Court on Kwamane Teashawn Hendrick's ("Defendant") Motion to Suppress, filed on April 6, 2021. (ECF No. 17.) The Grand Jury returned a two count Indictment on March 2, 2021, charging Defendant with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count One), and possession with the intent to distribute a substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a), (b)(1)(C) (Count Two). (ECF No. 13.) Each count turns on separate facts and discrete grounds occurring over one year apart.[1] On June 18, 2018, Richmond City Police Department ("RPD") arrested the Defendant on Count One, which evolved from the search of a rental vehicle he was driving. Approximately one year later, on August 2, 2019, Defendant was arrested on

---

[1] As these counts are unrelated and arise from distinct events, Defendant moved to sever Counts One and Two for trial. (ECF No. 16.) The Government did not object. (ECF No. 19). Accordingly, the Court granted the Motion to Sever in a May 5, 2021 Order (ECF No. 26) and will try each count separately.

Count Two after extensive surveillance of Defendant's activity on the curtilage of another individual's property.

Defendant filed the Motion to Suppress Evidence, embracing both Count One and Count Two, challenging the seizure of evidence on both occasions. (ECF No. 17.) In its response, the Government contends that, aside from the ample probable cause supporting each search, Defendant lacks the requisite standing to challenge either search. (ECF No. 18.) Both the Government and Defendant have filed memoranda supporting their respective positions on the legality of both searches, and the Court heard argument on May 4, 2021. After hearing the considerable evidence offered by each side, the Court ordered supplemental briefing focusing specifically on the evidence introduced at the hearing. (ECF No. 27.) For the reasons stated below, the Court will deny the Motion to Suppress in its entirety.

## I. The Search of the Rental Vehicle Operated by Defendant on June 21, 2018

On June 21, 2018, RPD Officer Kevin Hyde ("Officer Hyde") was on patrol with several other members of the RPD's Focus Mission Team. (Hr'g Tr. 35:25–36:21, [hereinafter "Tr."].) As they approached an intersection, they observed a Hyundai Elantra fail to come to a complete stop at a stop sign before executing a right-hand turn.[2] (Tr. 37:19–25.) The officers, in a marked patrol car, activated their emergency lights and pursued the vehicle. (Tr. 38:4–6.) After turning onto an adjacent street, Defendant pulled to the curb of the roadway, hastily alighted from the vehicle, and fled on foot as

---

[2] Virginia Code § 46.2-821 requires motorists to stop their vehicles at the marked stop line before entering an intersection controlled by a stop sign.

2

the officers approached. (Tr. 38:6–7.) Defendant left the engine in operation, resulting in the vehicle rolling back and striking the officers' car. (Tr. 38:13–15.) A later inspection of the vehicle operated by Defendant revealed that, as he emerged from the vehicle, he left the driver's door open and the transmission in reverse. (Tr. 39:16–21.)

According to Officer Hyde, RPD officers pursued Defendant on foot through residential property for approximately three blocks. (Tr. 40:1–16.) After leaping over a fence in the front yard of 2215 Keswick Avenue, he was apprehended in the rear yard and arrested for eluding the police. (Tr. 40:1–4.) The conversation that ensued was captured on a body camera worn by one of the arresting officers. Defendant informed the officers that he was not authorized to drive the car. (Gov't's Exs. 2–3.) Defendant further stated that he believed that the rental car may have been reported stolen. (Gov't's Ex. 4.) Lastly, he added that he was not on the rental agreement and reiterated that he was not entitled to have the car. (Gov't's Ex. 5.)

Officer Hyde also testified that, upon review of the Virginia Department of Motor Vehicles records, he learned that Defendant's driving privileges had been revoked. (Tr. 50:4–7.)[3] As the vehicle was situated along the curb of the roadway, Officer Hyde had the vehicle towed as an abandoned vehicle operated by an unlicensed driver. (Tr. 73:13–16.) RPD policy is to conduct an inventory search of a vehicle before it is towed to ensure that nothing dangerous or hazardous is left in the vehicle. (Tr. 73:17–74:8.)

---

[3] Operation of a motor vehicle in Virginia while a person's license is revoked is a class 1 misdemeanor. Va. Code Ann. § 46.2-301. The vehicle is also subject to impoundment. Va. Code Ann. § 46.2-301.1.

Pursuant to this policy, Officer Hyde conducted an inventory of the vehicle's contents before it was towed, which yielded a firearm in the center console. (Tr. 72:1–74:1.)[4]

The defense's first witness was Laura King ("Ms. King"), who testified that she leased the vehicle on June 18, 2018, and gave Defendant permission to drive it. (Tr. 8:2–9:16.) She indicated during her direct examination that the police did not have her permission to search the vehicle or tow it from the scene. (Tr. 10:15–22.) Ms. King also testified that, pursuant to the rental agreement, only persons listed on the agreement are allowed to drive the rental vehicle, and acknowledged that Defendant was not on the rental agreement. (Tr. 12:7–21.) Moreover, Ms. King admitted that the rental agreement prohibits any person from operating the vehicle in violation of any federal, state, or local law. (Tr. 15:7–21.)

The defense elicited the fact that Ms. King appeared at the location of the vehicle that evening, and, after inquiring about its status, she was advised by the officers that a towing service was contacted and the vehicle would be towed. (Tr. 9:16–10:3; 73:13–16.) Ms. King's testimony differed somewhat from the body camera footage, which revealed that the vehicle was already in the initial stage of being towed when Ms. King approached the scene. (*Compare* Tr. 13:25–15:2 *with* Gov't's Ex. 18.) Up to that point, no one at the scene identified themself as an authorized driver. Officer Hyde also indicated that, although he was not required to tow the vehicle, he decided to do so

---

[4] The parties have categorized the search as potentially falling under a myriad of exceptions to the warrant requirement. Based upon the evidence at the hearing, the Court finds that the search is best categorized as an inventory search.

4

because, in his experience, rental agencies routinely instruct the police to tow the vehicle rather than respond and take custody. (Tr. 66:1–18; 75:14–18.) Therefore, it was towed as an abandoned vehicle.

This Court's analysis of the legality of the inventory search turns on two axes. First, whether Defendant was an unauthorized driver without standing to challenge the search; or, alternatively, whether the officer reasonably determined the vehicle was abandoned on the curb of the roadway and therefore subject to impoundment and an inventory search.

In *Byrd v. United States*, the Supreme Court of the United States acknowledged that an operator of a rented vehicle who was not listed on the rental agreement but had legitimate possession of the vehicle could have a recognizable expectation of privacy. 138 S. Ct. 1518, 1524, 1526–28 (2018). However, the United States Court of Appeals for the Second Circuit recently found that the sole occupant and driver of a rental vehicle does not have an expectation of privacy when operating the vehicle without a valid license and without authorization to do so. *United States v. Lyle*, 919 F.3d 716, 729–30 (2d Cir. 2019) (finding *Byrd* inapplicable as the defendant could not legitimately operate a vehicle). In the immediate case, Defendant cannot have an expectation of privacy in the vehicle because he disavowed lawful possession and informed the officer that it had probably been reported stolen. *See Byrd*, 138 S. Ct. at 1526; *see also United States v. Beasley*, 824 F. App'x 154, 156 (4th Cir. 2020) (holding that, when a defendant "expressly disavowed ownership of the vehicle," the defendant did not have a privacy interest in the vehicle).

5

This Court concludes that Defendant lacks standing to challenge the search of the rental vehicle and seizure of the firearm. If a defendant denies ownership of certain property, the law does not accord him standing to contest the search or seizure of the property. *Rawlings v. Kentucky*, 448 U.S. 98, 104–06 (1980). Moreover, persons abandoning property have no standing to challenge its seizure. *Abel v. United States*, 362 U.S. 217, 241 (1960); *United States v. Stevenson*, 396 F.3d 538, 546–47 (4th Cir.) ("When a person voluntarily abandons his privacy interest in property, his subjective expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress evidence seized from it."), *cert. denied*, 544 U.S. 1067 (2005). Defendant admitted that he was neither the owner of the vehicle nor authorized to possess it; accordingly, he cannot challenge the search. *See Rawlings*, 448 U.S. at 104–06. Furthermore, Defendant cannot challenge the search of a vehicle that was abandoned.

Moreover, even if Defendant had the requisite standing to challenge the search of the interior of the vehicle, the firearm would have been inevitably discovered when Officer Hyde conducted an inventory of its contents prior to towing. *See Nix v. Williams*, 467 U.S. 431, 447 (1984) ("[I]f the government can prove that the evidence would have been obtained inevitably and, therefore, would have been admitted regardless of any overreaching by the police, there is no rational basis to keep that evidence from the jury in order to ensure the fairness of the trial proceedings."); *see also Colorado v. Bertine*, 479 U.S. 367, 375–76 (1987) (finding that choosing to impound a vehicle and perform an inventory search pursuant to standard police procedures is a reasonable exercise of discretion); *United States v. Bullette*, 854 F.3d 261, 266 (4th Cir. 2017) (holding that an

inventory search is a permissible exception to the warrant requirement). "If the vehicle is in lawful custody, the police may inventory the vehicle, if such inventories are routine and conducted pursuant to standard police procedures, so long as the purpose of the inventory is to secure the car or its contents and not to gather incriminating evidence against the owner." *United States v. Brown*, 787 F.2d 929, 931–32 (4th Cir. 1986) (citing *South Dakota v. Opperman*, 428 U.S. 364, 374 (1976)).

Officer Hyde's decision to impound the vehicle was predicated on a number of pertinent facts. Given the manner in which Defendant alighted from the vehicle and ran, a reasonable police officer could conclude that the operator wanted to avoid police contact. At that time, he informed Officer Hyde that he did not have permission to drive the car, and that he thought it had been reported stolen. (Gov't's Exs. 2–5.) Officer Hyde also determined that Defendant's license was revoked and that it was unlawful for him to operate a motor vehicle in Virginia. (Tr. 50:4–7.) Officer Hyde's conclusions and resulting actions must be weighed based on the information at hand when the vehicle was impounded and towed from the scene.

Given the attendant circumstances, Officer Hyde's decision to tow the unoccupied vehicle situated on the curb of the roadway was not unreasonable and the subsequent search was performed in accordance with RPD policy.[5] *See Brown*, 787 F.2d at 931–32. Even if Officer Hyde may have had other arguable alternatives to impoundment of the

---

[5] Defendant cites *United States v. Davis*, 997 F.3d 191 (4th Cir. 2021) to argue that the search of the vehicle is invalid. However, *Davis* primarily focuses on a search incident to arrest, not an inventory search. *See id.* at 201–02. Thus, *Davis* is not controlling authority here.

7

vehicle, his decision to do so was not unreasonable under the circumstances. *See Bullette*, 854 F.3d at 265–66. Therefore, Defendant's Motion to Suppress the firearm seized from the vehicle will be denied.

## II. The Search of 2113 Keswick Avenue on August 2, 2019

In June of 2019, RPD was contacted by a concerned citizen regarding drug activity on the 2100 block of Keswick Avenue. (Tr. 91:11–15.) This citizen was a resident of 2111 Keswick Avenue, and observed Defendant making multiple trips throughout the day from the backyard air conditioning unit to the front of the house. (Tr.100:19–101:9.) The citizen also sent RPD a photograph of the back yard of 2113 Keswick Avenue that showed a small table under an air conditioning unit, which, according to the concerned citizen, was used to cut and bag drugs. (Tr. 96:20–97:3.) Based upon this information, the RPD thereafter began an investigation of 2113 Keswick Avenue.

Detective Dominique Compton ("Detective Compton") was the case agent for RPD's investigation into the citizen's report. (Tr. 93:2–5.) Detective Compton described this area as an "open drug market"—an area where drugs are distributed openly—which limited the scope of their surveillance. (Tr. 90:18–22; 97:8–13.) The officers used two primary tactics to observe 2113 Keswick Avenue. First, Detective Compton and other RPD officers performed "roll-by" surveillance, which entailed driving by 2113 Keswick Avenue in a marked police car. (Tr. 92:20–93:1.) As they rolled by, they would identify who was outside and their locations. (*Id.*; Tr. 93:10–4.) Through this surveillance technique, the officers witnessed several hand-to-hand transactions and identified several targets for further investigation, including Defendant. (Tr. 93:19–94:19.)

8

Due to the nature of the area, the officers were unable to observe 2113 Keswick Avenue from an unmarked vehicle, but they obtained consent from the concerned citizen to perform surveillance from 2111 Keswick Avenue on two separate occasions. (Tr. 97:8–13; 125:23–126:3.) On August 2, 2019, Officer Ryan Novak ("Officer Novak") was stationed inside 2111 Keswick Avenue. (Tr. 164:23–165:4.) Officer Novak testified that he witnessed over twenty hand-to-hand transactions that morning on the curtilage of 2113 Keswick Avenue between Defendant and various individuals. (Tr. 166:10–17; 168:12–17.) He captured one such transaction on video using his cellphone, which depicted an individual on a moped passing money to Defendant and Defendant passing a small object—what Officer Novak presumed to be drugs—to the individual, who then drove off. (Gov't's Ex. 21; Tr. 172:9–173:2.) The officers also observed another such transaction with an individual in a gray pick-up truck. (Tr. 104:7–15.) Several RPD officers followed the truck and conducted a traffic stop. (Tr. 104:16–21.) One occupant was found in possession of a folded-up lottery ticket with a white substance inside, which was later determined to contain cocaine. (Tr. 104:22–107:1.)

The officers arrested Defendant after he left the property later that morning. (Tr. 108:4–25.) After performing a search incident to arrest, the officers discovered a large quantity of folded-up lottery tickets and $896 in U.S. currency. (Tr. 109:17–23.) Police used a drug dog to investigate the presence of narcotics on Defendant, but the dog did not alert. (Tr. 109:3–16.) Thereafter, the officers performed a warrantless search of the curtilage of 2113 Keswick Avenue. (Tr. 139:14–21; 148:19–149:17.) As a result of the search, the officers discovered several items: a cigar box that contained crack cocaine; a

9

digital scale; plastic baggies; and a razor blade with residue. (Gov't's Exs. 25A–G; Tr. 110:20–113:6.) The officers later obtained a search warrant and conducted a search of the residence. (Tr. 120:16–22.)

Thristan Greene, a resident and leaseholder of 2113 Keswick Avenue, testified as one of Defendant's witnesses. (Tr. 16:20–22.) Mr. Greene stated that Defendant would visit four or five times a week. (Tr. 18:24–19:5.) Defendant would watch Mr. Greene's dogs when he was out of town and often helped clean the back yard. (Tr. 19:20–20:6.) Mr. Greene also testified that Defendant would occasionally spend time inside the house to relax and socialize, play games, charge his phone, and watch sporting events on television, such as basketball games. (Tr. 19:10–16.)[6]

Considering this evidence, the Court must first determine whether Defendant has standing to challenge the warrantless search of the back yard of 2113 Keswick Avenue, and, alternatively, whether the evidence would be admissible under the doctrine of inevitable discovery. For a defendant to have standing to challenge a search of a residence, he must show that he has a reasonable expectation of privacy in the home. *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring) ("[F]irst, . . . a person [must] have exhibited an actual (subjective) expectation of privacy and, second, . .

---

[6] The record is unclear as to some of Mr. Greene's testimony, particularly regarding the use of the nickname "B." Specifically, Mr. Greene stated that "B" was a social guest at his residence. (Tr. 27:15–16.) The Government contends that "B" may be a nickname for a different person that is not Defendant and introduced evidence to that effect. (Tr. 119:17–120:15.) However, Mr. Greene testified that this is a general, informal reference to people, much like the term "bro," and he calls Defendant "B" because he could not recall the pronunciation of Defendant's name. (Tr. 27:11–14.) The Court need not resolve this factual dispute because, even assuming that Defendant is the "B" that Mr. Greene described as a visitor to his home, Defendant lacks standing to challenge the warrantless curtilage search of 2113 Keswick Avenue.

10

[must] be one that society is prepared to recognize as 'reasonable.'"). Social guests may have a protected privacy interest in a residence, but individuals only present for a business expectancy do not have a privacy interest. *Minnesota v. Carter*, 525 U.S. 82, 90 (1998) (holding that, when defendants "were essentially present for a business transaction and were only in the home a matter of hours," they did not allege a privacy interest protected by the Fourth Amendment); *Minnesota v. Olson*, 495 U.S. 91, 93 (1990) (holding that an overnight guest in a home has an expectation of privacy).

The United States Court of Appeals for the Fourth Circuit reaffirmed these tenets in *United States v. Gray*, 491 F.3d 138 (4th Cir. 2007). In *Gray*, the court emphasized the distinction between social and business guests. *Id.* at 145–46. Because the defendant there was selling drugs out of his co-defendant's residence, the court reasoned that he was a business—not a social—guest. *Id.* at 146. This was despite the fact that the defendant visited his co-defendant's residence four to five times each week, "would watch [television], play video games and 'do other things' around the house," and even kept some personal possessions including some clothes, a toothbrush, and his PlayStation console at the co-defendant's house. *Id.* at 151. Crucially, the presence of drugs, weapons, and customers evinced a commercial relationship. *Id.* at 147. The court found "the presence of scattered personal possessions [in]sufficient to transform a business relationship into a social one." *Id.* Therefore, the court held that the defendant did not have a legitimate expectation of privacy in his co-defendant's residence and could not challenge the search. *Id.* at 154.

11

Conspicuously absent from the record before this Court is any evidence that Defendant had a legitimate expectation of privacy in 2113 Keswick Avenue. Based upon the police surveillance, Defendant was primarily using 2113 Keswick Avenue to peddle drugs. Police identified him at several "roll-bys" and witnessed him participating in over twenty hand-to-hand transactions throughout the morning of August 2, 2019. (*E.g.*, Tr. 93:19–94:19; 166:10–17; 168:12–17.) Though Defendant did spend time at the residence playing games, relaxing, and socializing, when taken in the context of his overall purpose at the residence, these facts alone are insufficient to convey an expectation of privacy. *Compare* Tr. 19:10–16 *with Gray*, 491 F.3d at 151. Defendant's presence at 2113 Keswick Avenue was primarily commercial in nature, and thus, he cannot challenge the warrantless curtilage search.

Even if Defendant had a reasonable expectation of privacy in 2113 Keswick Avenue, the evidence would still be admissible under the doctrine of inevitable discovery. *See Nix*, 467 U.S. at 447. Although the Government performed a warrantless search of the exterior of 2113 Keswick Avenue to find the drugs and other drug paraphernalia, "the inevitable discovery rule may be applied even though the evidence validly obtained under a search warrant was previously uncovered in an illegal search." *United States v. Whitehorn*, 813 F.2d 646, 650 (4th Cir. 1987).

Regardless of the officers' delay in obtaining the search warrant until after the search and seizure of the contraband in the back yard, the officers would have inevitably discovered the evidence. The RPD officers had probable cause sufficient to form the basis for a warrant to search 2113 Keswick Avenue prior to the warrantless curtilage

search. RPD officers observed over twenty hand-to-hand drug transactions at the residence; encountered one individual recently at 2113 Keswisk Avenue with cocaine in a folded-up lottery ticket; and discovered lottery tickets and $896 in U.S. currency on Defendant's person at the time of his arrest. The officers could have obtained a search warrant based upon this information alone, and would have found the drugs and related paraphernalia seized in the warrantless curtilage search. (*See* Gov't's Ex. 24; *see also* Tr. 121:7–122:16 (describing the information contained in Detective Compton's affidavit that she knew prior to executing warrantless curtilage search).) Even assuming that Defendant had a reasonable expectation of privacy in 2113 Keswick Avenue, the evidence would have been inevitably discovered and is therefore admissible.

## III. CONCLUSION

In sum, the Court finds that Defendant lacks standing to challenge the search of both the car and the house. Accordingly, the Motion to Suppress will be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
Senior United States District Judge

Date: June 10, 2021
Richmond, Virginia